UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

NORMAN SHY,

Defendant.

Case No. 16-cr-20218

Hon. Victoria A. Roberts

---

J. Michael Buckley
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
313.226.9581
michael.buckley@usdoj.gov

Frances Lee Carlson
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
313.226.9696
frances.carlson@usdoj.gov

Christopher A. Andreoff (P10193)
Jaffe Raitt Heuer & Weiss, P.C.
Attorney for Defendant
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
248.352.2555
candreoff@jaffelaw.com

---

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Norman Shy ("Defendant"), through his counsel, Christopher A. Andreoff of Jaffe Raitt Heuer & Weiss, P.C., respectfully submits this Memorandum regarding issues relevant to sentencing.

3532304.v1

## I. **Plea Agreement**

On May 11, 2016, Defendant pled guilty to Count One of the Information which charged Conspiracy to Commit Federal Program Bribery in violation of 18 U.S.C. § 371 and 666(a)(1)(B), and Count Two which charged Federal Income Tax Evasion in violation of 26 U.S.C. § 7201.

The Rule 11 Plea Agreement ("Agreement") reflects a Total Offense Level of 27 with a guideline range of 70 to 87 months. The Agreement provides in paragraph 3(A), page 7, that any custodial sentence shall not exceed the top of the sentencing guideline range.

The Rule 11 Plea Agreement also indicates that Defendant agrees to forfeit the "subject property" as identified at pages 8 and 9 and to entry of a money judgment in the amount of $2,768,846.93.

Pages 14 to 15 of the Rule 11 Plea Agreement, in pertinent part states that:

The Defendant and his spouse will execute IRS Form 870 which encompasses tax years 2009 through 2013, and agree to the tax, penalties, and interest calculations as prepared by the IRS. In the event that the Defendant and/or his spouse pay any or all of the full balance due for tax years 2009 through 2013 within 45 days or thereafter of signing the Form 870, then no amended IRS tax returns for years 2009 to 2013 will be required and the additional obligations will not be applicable to the Defendant.

2

## II. Sentencing Factors

The factors set forth in 18 U.S.C. § 3553(a) that guide a judge in determining the appropriate sentence since the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005) are certainly well known to the Court, as is the requirement that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes. Familiar, too, is the Supreme Court's admonition in *Gall v. United States*, 522 U.S. 38 (2007), that in applying these factors, a sentencing judge "make an individualized assessment based on the facts presented."

Although the promulgation of the Guidelines was an attempt by Congress to promote uniformity in sentencing, *Booker* and its progeny, as well as the factors set forth in 18 U.S.C. § 3553(a) make clear that sentencing involves more than a formulaic response to crime and punishment, and requires the sentencing court to consider offender characteristics that go beyond the simple issue of criminal history, the only Guideline factor that speaks to the characteristics of the offender, rather than of the offense.

Indeed, in *United States v. Gall*, 522 U.S. 38, 128 S.Ct. 586, 596 (2007), the Supreme Court specifically stated that a formulaic approach to sentencing is inappropriate:

3

3532304.v1

On the other side of the equation, the mathematical approach assumes the existence of some ascertainable method of assigning percentages to various justifications. Does withdrawal from a conspiracy justify more or less than, say, a 30% reduction: Does it matter that the withdrawal occurred several years ago? Is it relevant that the withdrawal was motivated by a decision to discontinue the use of drugs and to lead a better life? What percentage, if any should be assigned to evidence that a defendant poses no future threat to society, or to evidence that innocent third parties are dependent on him? The formula is a classic example of attempting to measure an inventory of apples by counting oranges.

The Supreme Court also made clear that in applying the § 3353(a) factors, a sentencing judge "must make an individualized assessment based on the facts presented" by the case, without giving presumptive weight to the Guidelines sentencing range:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district Judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

*Id* at 596-597.

Such an approach, which gives individualized consideration to *all* of the sentencing factors identified by the statue is not only commanded by the *Booker* holding, but is logical as well, in view of the degree to which the Guidelines are

4

driven principally by the nature of the offense conduct, and only minimally by the characteristics of the particular offender and his or her life and character. As the Supreme Court noted in *Gall*, quoting its earlier opinion in *Koon v. United States,* 518 U.S. 81, 113 (1996), "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id* at 598.

U.S.P.O. Catrell of the United States Probation Department has prepared a very thorough and excellent Presentence Investigation Report ("PSIR") and counsel will not reiterate what is contained in the report. Nevertheless, undersigned counsel believes it appropriate to emphasize some of the information contained in the PSIR and to supplement it with additional information.

Defendant has taken full and complete responsibility for his conduct, evidenced in part by his plea of guilty to multiple counts in the Information on May 11, 2016. In addition, Defendant has been forthright in his admission that he defrauded the Detroit Public Schools ("DPS") by paying various principals $908,000. He is starkly aware of and deeply regrets the harm that he has caused the school district.

Because Defendant has accepted responsibility, the only question before this Court is what sentence is "sufficient, but not greater than necessary, to comply

5

3532304.v1

with the purposes set forth in § 3553(a)." Under § 3553(a) the Court, in addition to the Guideline range, should consider the following factors:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed –

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

\* \* \*

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7)    the need to provide restitution to any victims of the offense.

**1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

A.    Nature of the Offense.

From 2009 to 2014[1], Defendant operated Allstate Sales Inc., which, as an approved vendor, provided school supplies and other services to the school district.

---

[1] This is the time frame charged in the Information. Defendant operated Allstate since 1974 and provided services not only to DPS for 40 years, but to other customers as well.

3532304.v1

DPS employed various administrators and principals who then had the authority to select and use vendors such as Defendant's company to provide school supplies and services.

Defendant paid DPS principal/Assistant Superintendent, Clara Flowers, monies totaling $324,785 in return for approving and authorizing fraudulent invoices for school supplies that were not supplied or ordered. As a result, DPS paid Defendant's company for goods never received.

During the same period of time, Defendant had similar arrangements with other DPS principals. The total amount paid to all administrators/principals was $908,000. In return, Defendant obtained $2,700,000.00 from DPS for specific goods that were not received.

Count Two charges Income Tax Evasion for the year 2011 in the amount of $51,667.00. He failed to report his illegal remunerations for that year. It should be noted, however, that since then Defendant has paid all of the tax due for 2011 plus all accrued interest and penalties.

In consultation with the IRS and the U.S. Attorney's Office (see Pages 14 to 16 of the Rule 11 Plea Agreement), Defendant and his wife also executed IRS Form 870 reflecting all taxes due and owing, including any penalties and accrued interest for the years 2009 to 2013. As of this writing, all of the taxes, penalties and interest owed to the IRS for tax years 2009, 2010 and 2011 have been paid. In

7

3532304.v1

addition, $15,000 has been paid for the tax year 2012. Remaining to be paid are the taxes, penalties and interest for 2012 and 2013.

The guidelines calculated in the PSIR are accurate. They are driven predominantly by the loss figure. Defendant submits, however, that the guideline calculations regarding the loss figure fail to take into account a number of his individual life characteristics and other mitigating circumstances.

In an article published in the October, 2013 issue of the Federal Sentencing Reporter, the author, after performing an exhaustive study of the sentencing data published by the United States Sentencing Commission, noted that while "loss is far and away the primary determinant of the advisory sentencing commission range under Section 2B 1.5," based on sentences imposed by judges throughout the country, loss is a poor measuring stick of culpability:

> After more than a quarter-century of using loss as a primary sentencing factor for diverse offenses and disparate offenders, what do the commission's sentencing data tell us about judges' views of the relative importance or unimportance of loss amount, is currently measured by codified in the sentencing guidelines? In sum, the data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the guidelines when they impose sentences in white-collar cases.

Mark Allenbaugh, "Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines in Lost Data, 26 Fed.Sent.Rep. 19 (2013).

8

Nevertheless, Defendant recognizes that the amount of loss can be an indicator of culpability, and in this case, his culpability was admittedly patent and prolonged. There are however, countervailing factors that should have an effect in determining an appropriate sentence.

B.       The History and Characteristics of Defendant.

Defendant will be 75 years old on October 16, 2016. He was born and raised in Detroit and graduated from Mumford High School in 1959. He subsequently obtained a Bachelor of Arts degree from Michigan State University and a Master of Arts degree from Wayne State University. He also earned 21 credit hours toward a PhD at Wayne State University.

As reflected in the PSIR, he lost his parents when he was relatively young. His father was murdered in an armed robbery, and his mother suffered and died from pancreatic cancer in 1984. Defendant has been married for over fifty (50) years, has three children and two grandchildren. His wife and children describe him as a "loving, compassionate, caring and devoted person" who has been involved in many charitable organizations such as the Red Cross, and an animal rescue organization. It is sadly ironic that he has over the years donated monies, school supplies and clothing and other items to the Detroit Public Schools.

Defendant has been a vendor for the Detroit Public Schools for forty years from 1974 to 2014. In the 70's and 80's, he had contracts to supply audio visual

9

equipment, record and cassette players, listening centers with headsets, laminating equipment, projectors, kitchen appliances, furniture and school supplies.

From 1993 to 2007, he received many letters of appreciation from DPS school employees for his various contributions to the schools. (Attached as **Exhibit A** are a representative sample of twenty-five (25) letters from 1993 to 2007, reflecting Defendant's gifts or donations to DPS). These letters predate the offense at issue; that is by design. They are offered to demonstrate that the Defendant, despite his greed-filled actions in the latter years, was an honest, upright businessman for the bulk of his career

The experience of living in this world teaches us that human beings, and human lives, are usually multifaceted, and that a persona cannot be fairly judged on the basis of only one aspect of his or her life. Unfortunately, it is the character lapse that brings him before this Court. This case represents Defendant's first and only conviction. When the entire picture of Defendant's life and circumstances, are considered, in conjunction with his acceptance of responsibility, his age and health status, a rounder perspective is presented, one that warrants a variance from the guidelines under § 3553(a).

In this regard, I ask the Court to closely review the forty-two (42) character letters that were submitted to the Court which provides substantial insight from people who know him best, including close friends, business associates and family

3532304.v1

members. These letters provide additional insight about Defendant's character and talk about many people Defendant has assisted who were in need.

C.  Incapacitation.

There is simply no reason to believe that it is necessary to imprison Defendant for the time period reflected in the Rule 11 in order to protect society. On the contrary, his forty (40) year history of providing service to the DPS and the Detroit community without any previous incidents or allegations of wrongdoing, should be viewed as a positive factor, not a negative one.

"The rationale for incapacitation is to allow society to "protect itself from persons deemed dangerous because of their past criminal history." *Allen v. Woodford,* 395 F.3d 979, 1009 (9th Cir. 2004) (citing 1 W. LaFave & A. Scott, Substantive Criminal Law 38 § 1.5(2003)). As noted above and below, Defendant, who is just short of his 75th birthday, is in very poor health, is no longer doing any business with DPS, and will not pose any further danger to the community that he will be involved in any criminal activity.

D.  Rehabilitation.

Based upon Defendant's age, background, and medical condition, it seems quite clear that he will not engage in criminal conduct in the future. In *Tapia v United States,* 564 U.S. 319, 131 S.Ct. 2382 (2011), the United States Supreme

11

Court held that 18 U.S.C. § 3582(a) precludes a sentencing court from imposing or lengthening a prison term to promote an offender's rehabilitation.

## 2.   The Kinds of Sentences Available

Defendant recognizes that a sentence of imprisonment may be imposed. The only question is what sentence is sufficient but not greater than necessary to fulfill the purposes of 18 U.S.C. § 3553(a).

## 3.   The "Need For The Sentence" To Comport With The Traditional Purposes Of Punishment.

### A.   Retribution

The first of the statutory factors – that the sentence imposed should "reflect the seriousness of the offense, . . . promotes respect for the law, and. . . provide just punishment for the offense," echoes the traditional concept of "retribution." Such measurements are of course difficult to draw with precision, and, do not lend themselves to objective criteria.

This offense represents Defendant's only conviction. The consequences arising from this conviction are extremely severe. His indictment and plea have severely damaged his reputation in the community, resulted in extensive negative media attention, and will result in some form of punishment or incarceration, with likely separation from his wife, children and grandchildren.

12

## B.    Deterrence

The need to fashion a punishment which will deter others from engaging in conduct similar to that engaged in by of Defendant is a factor for this court's consideration, but it is respectfully submitted that any sentence of incarceration will serve as a sufficient deterrence to others who might engage in similar conduct, especially given the extensive publicity.

Moreover, a sentence of incarceration for a Defendant who will be 75 years old, and his loss of his businesses will not only preclude Defendant from ever engaging in any similar criminal conduct, but will send a loud message to deter others from doing so.

## 4.    The Need to Avoid Unwarranted Sentencing Disparity

Defendant has been properly charged, stands convicted and his identifiable assets have and will continue to be forfeited by the Government to provide restitution to DPS.

However, given this Court's handling of the case, the court is intimately aware of the facts surrounding the fraud perpetrated against the DPS by not only Defendant, but also the twelve (12) other administrators and/or principals who were charged in either this case or in other cases now pending in U.S. District Court, Eastern District of Michigan.

13

3532304.v1

In each case, it is readily apparent that each public employee of the DPS had the power, discretion, and authority to select vendors to provide school supplies, and in turn requested and then reviewed each submitted invoice by the vendor. The public school official then approved the invoice which resulted in DPS issuing an approved purchase order and ultimately payment to the vendor for school supplies that were not delivered or produced.

Without the knowing and willful participation by each school official, who similarly breached their fiduciary duties to DPS, along with the vendor, no fraud would have been perpetrated against DPS. Yet, an examination of each Rule 11 Plea Agreement of the twelve (12) DPS school officials (who have tendered guilty pleas) does not reflect any claim for restitution for the precise amount of each fraudulent invoice that they approved and submitted to DPS for payment. The only claim for restitution in each plea agreement appears to be the amount of the bribe each respective public official received which in turn dramatically reduces the amount of any obligation to pay restitution, and their exposure under the U.S. Sentencing Guidelines. Most importantly, DPS' ability to receive full restitution for each fraudulent invoice that was approved may be impacted.

In imposing its sentence, it is requested that the Court take into account each co-conspirators' sentence exposure in order to avoid a disparate sentence. Defendant has also agreed to forfeiture of a significant amount of property and this

14

3532304.v1

also constitutes punishment which this Court should consider in crafting a "sufficient but not greater than necessary" sentence. In fact, while it could be argued Defendant should bear this responsibility to a greater degree, it appears he has done so and this fact should not be ignored in the sentencing process.

### III. Variance/Departure

A.    Age and Physical and Mental Health

At pages 15 through 19 of the PSIR, U.S.P.O. Lara Catrell extensively documented and identified for the Court Defendant's several medical issues. Because of privacy concerns, Counsel for Defendant will not identify those issues in this Memorandum.

However, Counsel for Defendant requests the Court to give serious consideration to Defendant's age, his physical, mental and medical conditions as a sufficient basis for a variance/departure from the guideline range. The probation officer at page 27, paragraph 121 of the PSIR, has also indicated that the Court should consider one of these issues as well as a factor justifying a below-guidelines sentence.

U.S.S.G. § 5H1.1 reads as follows:

Age (Policy Statement)

Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered

15

3532304.v1

by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

\* \* \* \* \*

U.S.S.G. § 5H1.3 states:

Mental and Emotional Conditions (Policy Statement)

Mental and emotion conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K. Subpart 2 (Other Grounds for Departure).
In certain cases a downward departure may be appropriate to accomplish a specific treatment purposes. See §5C1.1, Application Note 6.

Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§5B1.3(d)(5) and 5D1.3(d)(5)).

In addition, U.S.S.G. § 5H1.4 reads in pertinent part:

Physical Condition, Including Drug or Alcohol Dependence
or Abuse; Gambling Addiction (Policy Statement)

Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward, e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

\* \* \* \* \*

16

3532304.v1

Defendant suffers from a number of serious medical conditions requiring many medications and close medical attention and treatment by various physicians. In determining what sentence to impose, counsel believes that any term of incarceration may create a substantial physical and medical hardship for him if he is sent to prison for a lengthy period of time. The PSIR identifies the specific maladies and medical conditions from which the Defendant suffers in four (4) pages (see pages 15 to 19) of the PSIR.

According to the World Health Organization, in 2013, the life expectancy of a male United States citizen is 76 years. http://apps.who.int/gho/data/node.main.688 as viewed on August 16, 2016. Should this Court impose a significant custodial sentence in this case, it is virtually a life sentence, and it will certainly be a more lengthy sentence by anybody's measurement based upon Defendant's current age of 74.

In addition, any custodial sentence, should the Court decide to impose one, will also have a practical component. According to an article in the Washington Post in 2015, "prisoners 50 and older represent the fastest-growing population in crowded federal correctional facilities, their ranks having swelled by 25% to nearly 31,000 from 2009 to 2013. www.washingtonpost.com/sf/national/2015/05/02/the-painful-price-of-aging-in-prison,

3532304.v1

as viewed August 16, 2016.  (See **Exhibit B**).  The article also notes how an aging prison population drives up costs:

> The aging of the prison population is driving health-care costs being borne by American taxpayers. The Bureau of Prisons saw health-care expenses for inmates increase 55 percent from 2006 to 2013, when it spent more than $1 billion. That figure is nearly equal to the entire budget of the U.S. Marshals Service or the Bureau of Alcohol, Tobacco, Firearms and Explosives, according to the Justice Department's inspector general, who is conducting a review of the impact of the aging inmate population on prison activities, housing and costs.
>
> * * *
>
> The average cost of housing federal inmates nearly doubles for aging prisoners. While the cost of a prisoner in the general population is $27,549 a year, the price tag associated with an older inmate who needs more medical care, including expensive prescription drugs and treatments, is $58,956, Justice Department officials say.

*Ibid.*

As referenced in the above article, the Office of Inspector General for the U.S. Department of Justice issued a revised report dated February, 2016 entitled "The Impact of An Aging Inmate Population On The Federal Bureau of Prisons" which discusses how the U.S. Bureau of Prisons is <u>unable</u> to adequately care for its "aging" inmate population, the substantial costs to house aging inmates, and that for the elderly inmate due to overcrowding, average wait time for outside medical treatment takes nearly four months.   See https://oig.justice.gov/reports/2015/e1505.pdf.

Without appending the entire 66 page OIG report, counsel for Defendant will append as **Exhibit C** the Executive Summary and the Conclusions and

18

Recommendations to the Report. In the Summary it states at Page ii:

\* \* \* \* \*

> We further found that the increasing population of aging inmates has resulted in a need for increased trips outside of institutions to address their medical needs but that institutions lack Correctional Officers to staff these trips and have limited medical staff within institutions. As a result, aging inmates experience delays receiving medical care. For example, using BOP data from one institution, we found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days.

\* \* \* \* \*

Consequently, counsel for Defendant is asking this Court to give serious consideration in granting a substantial departure from the guideline range, and if any period of incarceration is being considered, to ensure that Defendant receives appropriate medical care based upon his age and his current medical conditions.

B.     Restitution and Tax Liabilities.

1.     Restitution

Defendant has agreed to make restitution. At the request of the Government, Defendant executed a Financial Statement of Debtor and has identified and provided the financial documentation as requested by that Statement. Several of Shy Investment real properties have been sold and the proceeds have been or will be turned over to the U.S. Marshals Service.

19

3532304.v1

Negotiations are still on-going, and counsel for Defendant has had meetings with Government counsel in an effort to resolve all outstanding real and personal property issues which relate to forfeiture and restitution. It is anticipated that the Government will collect from Defendant over $1,600,000.

### 1.    Tax Liability

As stated earlier regarding Count 2 of the Information, all of the 2011 tax liability ($51,667.00) plus all penalties and interest have been paid by Defendant. In addition, all of the taxes, penalties and interest for years 2009 and 2010 have been paid in full. Approximately $15,000 in taxes has been paid for 2012, but outstanding taxes, penalties and interest are still owed for 2012 and 2013. This was done is accordance with the Rule 11 Plea Agreement and in consultation with the IRS CID and IRS Revenue agents.

## IV. Conclusion

Counsel for Defendant and Defendant recognize that the conduct that led to criminal charges and ultimate guilty pleas is serious and demands an appropriate sentence. While the Government may call for a significant sentence with all of the accompanying media attention, the danger here is that in so responding to the symbolism of retribution, to the exclusion of all else, that "justice would wear a

20

3532304.v1

countenance too sanguinary and cruel." The Federalist No. 74 (Hamilton).[2]

As an officer of the Court, and adhering to this Court's Rules of Professional Conduct, I have not responded in the media or to the many factual inaccuracies and errors that have been reported about my client. We hope that the Court will not be unduly affected or swayed by this external influence.

One example of the inaccuracies is that there was a prominent display in one of the newspapers of Defendant's "palatial" home in Farmington Hills, which was sold at a considerable loss before the federal investigation commenced in late November, 2014. What was not reported was that this home was purchased and improved in 1998 and 1999, some 10 years before the alleged conspiracy. There have been many other inaccuracies about Defendant, but the sole issue here is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.

---

[2] In this essay, Hamilton is discussing the pardon power of the president, but his observations may also be read as touching on the appropriateness of a judge looking beyond retribution seems clearly merited and is most loudly called for:

> As the sense of responsibility is always strongest in proportion as it is undivided, it may be inferred that a single man would be most ready to attend to the force of those motives, which might plead for a mitigation of the rigor of the law, and least apt to yield to considerations, which were calculated to shelter a fit object of its vengeance. The reflection that the fate of a follow creature depended on his sole fiat, would naturally inspire scrupulousness and caution: the dread of being accused of weakness or connivance would beget equal circumspection, though of a different kind.

*Ibid.*, http://avalon.law.yale.edu/18th_century /fed74.asp , as viewed June 14, 2015.

21

On behalf of my client, I am requesting that the Court impose a fair and just sentence.  In this regard, if the Court is considering a period of incarceration notwithstanding the factors stated above, Counsel for Defendant is recommending, based upon the requests for departures and Defendant's background that it impose a sentence not to exceed 30 to 36 months.

JAFFE, RAITT, HEUER & WEISS, P.C.


By:   /s/ Christopher A. Andreoff
Attorney for Defendant Norman Shy
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
candreoff@jaffelaw.com
(P10193)

Dated:  August 18, 2016


## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2016, I electronically filed the foregoing Defendant's Sentencing Memorandum with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s/ Christopher A. Andreoff
Jaffe, Raitt, Heuer & Weiss P.C.
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
candreoff@jaffelaw.com
P10193

22

3532304.v1