# EXHIBIT C



Office of the Inspector General
U.S. Department of Justice

# The Impact of an Aging Inmate Population on the Federal Bureau of Prisons

Revised February 2016

Evaluation and Inspections Division 15-05                    May 2015

# EXECUTIVE SUMMARY

## Introduction

In September 2013, the Federal Bureau of Prisons (BOP) incarcerated 164,566 federal inmates in 119 BOP-managed institutions.[1] According to BOP data, inmates age 50 and older were the fastest growing segment of its inmate population, increasing 25 percent from 24,857 in fiscal year (FY) 2009 to 30,962 in FY 2013.[2] By contrast, during the same period, the population of inmates 49 and younger decreased approximately 1 percent, including an even larger decrease of 16 percent in the youngest inmates (age 29 and younger).[3] Based on BOP cost data, we estimate that the BOP spent approximately $881 million, or 19 percent of its total budget, to incarcerate aging inmates in FY 2013.[4] The Office of the Inspector General (OIG) conducted this review to assess the aging inmate population's impact on the BOP's inmate management, including costs, health services, staffing, housing, and programming. We also assessed the recidivism of inmates who were age 50 and older at the time of their release.

## Results in Brief

The OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.

*Aging inmates are more costly to incarcerate, primarily due to their medical needs.* We found that the BOP's aging inmate population contributes to increases in incarceration costs. Aging inmates on average cost 8 percent

---

[1] For this review, we examined sentenced inmates incarcerated in BOP-managed institutions only. We excluded approximately 29,000 inmates who are incarcerated in contract institutions, as well as approximately 14,000 pre-trial inmates.

[2] For the purposes of this review, we define inmates age 50 and older as "aging." For more information, see page 2.

[3] The percentage decrease in the youngest inmates (age 29 and younger) was listed incorrectly as 29 percent when this report originally was issued in May 2015. We discovered the error and have revised the report to correct it.

[4] For more information, see Appendix 1.

Case 2:16-cr-20218-VAR-RSW  ECF No. 39-4, PageID.272  Filed 08/18/16  Page 4 of 10

more per inmate to incarcerate than inmates age 49 and younger (younger inmates). In FY 2013, the average aging inmate cost $24,538 to incarcerate, whereas the average younger inmate cost $22,676. We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose.* Aging inmates often require assistance with activities of daily living, such as dressing and moving around within the institution. However, institution staff is not responsible for ensuring inmates can accomplish these activities. At many institutions, healthy inmates work as companions to aging inmates; but training and oversight of these inmate companions vary among institutions. We further found that the increasing population of aging inmates has resulted in a need for increased trips outside of institutions to address their medical needs but that institutions lack Correctional Officers to staff these trips and have limited medical staff within institutions. As a result, aging inmates experience delays receiving medical care. For example, using BOP data from one institution, we found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days. In addition, we found that while Social Workers are uniquely qualified to address the release preparation needs of aging inmates, such as aftercare planning and ensuring continuity of medical care, the BOP, which employs over 39,000 people, has only 36 Social Workers nationwide for all of its institutions. Institution staff told us they themselves did not receive enough training to identify the signs of aging.

*The physical infrastructure of BOP institutions cannot adequately house aging inmates.* Aging inmates often require lower bunks or handicapped-accessible cells, but overcrowding throughout the BOP system limits these types of living spaces. Aging inmates with limited mobility also encounter difficulties navigating institutions without elevators and with narrow sidewalks or uneven terrain. The BOP has not conducted a nationwide review of the accessibility of its institutions since 1996.

*The BOP does not provide programming opportunities specifically addressing the needs of aging inmates.* BOP programs, which often focus on education and job skills, do not address the needs of aging inmates, many of whom have already obtained an education or do not plan to seek further employment after release. Though BOP institutions can and do design programs, including release preparation programs, to meet the needs of their

individual populations, even institutions with high percentages of aging inmates rarely have programs specifically for aging inmates.

*Aging inmates commit less misconduct while incarcerated and have a lower rate of re-arrest once released.* Aging inmates, comprising 19 percent of the BOP's inmate population in FY 2013, represented 10 percent of all the inmate misconduct incidents in that year. Also, studies have concluded that post-release arrests decrease as an individual ages, although BOP does not maintain such data. The OIG conducted a sampling of data and found that 15 percent of aging inmates were re-arrested for a new crime within 3 years of release. Based on our analysis, the rate of recidivism of aging inmates is significantly lower than the 41 percent re-arrest rate that the BOP's research has found for all federal inmates. We further found that most of the aging inmates who were re-arrested already had a documented history of recidivism.

*Aging inmates could be viable candidates for early release, resulting in significant cost savings; but BOP policy strictly limits those who can be considered and, as a result, few have been released.* Over a year ago, the Department concluded that aging inmates are generally less of a public safety threat and the BOP announced an expanded compassionate release policy to include them as part of the Attorney General's "Smart on Crime" initiative. However, the Department significantly limited the number of inmates eligible for this expanded release policy by imposing several eligibility requirements, including that inmates be at least age 65, and we found that only two inmates had been released under this new provision. According to institution staff, it is difficult for aging inmates to meet all of the eligibility requirements of the BOP's new provisions. Our analysis shows that if the BOP reexamined these eligibility requirements its compassionate release program could result in significant cost savings for the BOP, as well as assist in managing the inmate population.

## Recommendations

In this report, we make eight recommendations to improve the BOP's management of its aging inmate population. These recommendations include enhancing BOP oversight and training of inmate companions, studying the impact of the aging inmate population on infrastructure, developing programs to address the needs of aging inmates during their incarceration and as they prepare for release, and revising the requirements that limit the availability of compassionate release for these inmates.

# TABLE OF CONTENTS

BACKGROUND ........................................................................................... 1

PURPOSE, SCOPE, AND METHODOLOGY........................................................ 9

RESULTS OF THE REVIEW ......................................................................... 10

    Aging inmates are more costly to incarcerate, primarily due to their medical
    needs....................................................................................................... 10

    BOP institutions lack appropriate staffing levels to address the needs of an aging
    inmate population and provide limited training for this purpose..................... 16

    The physical infrastructure of BOP institutions cannot adequately house aging
    inmates................................................................................................... 23

    The BOP does not provide programming opportunities specifically addressing the
    needs of aging inmates ............................................................................. 30

    Aging inmates commit less misconduct while incarcerated and have a lower rate
    of re-arrest once released.......................................................................... 37

    Aging inmates could be viable candidates for early release, resulting in
    significant cost savings; but new BOP policy strictly limits those who can be
    considered and as a result, few have been released. ..................................... 41

CONCLUSION AND RECOMMENDATIONS......................................................... 51

APPENDIX 1:  EXPANDED METHODOLOGY..................................................... 55

APPENDIX 2:  THE BOP'S RESPONSE TO THE DRAFT REPORT ........................... 60

APPENDIX 3:  OIG ANALYSIS OF THE BOP'S RESPONSE................................... 63

## CONCLUSION AND RECOMMENDATIONS

We concluded that a growing aging inmate population has an adverse impact on the BOP's ability to provide a safe, humane, cost-efficient, and appropriately secure environment for aging inmates and to assist aging inmates reentering the community. Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it. Several aspects of the BOP's inmate management, including costs, housing, and programming, are affected by an aging inmate population that is growing more quickly than the rest of the BOP's inmate population.

First, aging inmates are more costly to incarcerate than their younger counterparts. According to our analysis of BOP data, an aging inmate costs 8 percent more to incarcerate than a younger inmate due in large part to increased medical needs. Further, aging inmates represent one-third of the population at the BOP's six medical centers, which at $59,000 per inmate per year are the BOP's highest-cost institutions. In FY 2013, the BOP spent $1.1 billion of its $6.5 billion budget (17 percent) on health services. In that same year, institutions with the highest percentage of aging inmates spent an average of $10,114 per inmate on medical costs, while institutions with the lowest percentage of aging inmates spent an average of $1,916 per inmate. The continuing increase in the aging inmate population will drive even greater increases in medical spending, especially at institutions with the highest percentages of aging inmates.

Second, BOP institutions lack appropriate staffing levels and offer limited training to address the needs of an aging inmate population. Some institutions have established local inmate companion programs to assist aging inmates with the activities of daily living. However, we found that these programs lack consistent oversight and that implementation varies by institution. We believe the BOP should develop a standardized program to ensure consistency in the implementation of the companion program, as well as set clear program expectations for companions in order to reduce the risk of victimization of aging inmates. We also believe the BOP should implement more training to help staff recognize and respond to the signs of aging. If institution staff is appropriately trained, the inmates' underlying medical needs could be met with care instead of disciplinary action.

Third, the BOP cannot sufficiently house aging inmates at all institutions because of limitations in physical infrastructure. Specifically, overcrowding of BOP institutions results in an inadequate number of lower bunks needed to accommodate aging inmates with limited mobility. Overcrowding also restricts the BOP's ability to move aging inmates to institutions, including its medical centers, that can best address aging inmates' medical needs. Institutions, including those with higher care levels or a high percentage of aging inmates, lack sufficient handicapped-accessible

51

cells and bathrooms and have difficulty accommodating the number of inmates who need elevators. As a result, aging inmates may be placed in compromising and sometimes unsafe situations due to limitations in institutions' physical infrastructure. The BOP has not evaluated all institutions' accessibility for inmates with mobility impairments since 1996. We believe that, due to the growing aging inmate population, the BOP should reexamine the accessibility of all of its institutions to accommodate the large number of aging inmates with mobility needs. BOP staff and officials told us that separate units, or entire institutions, might be more appropriate to house aging inmates. Units designated specifically for aging inmates, supplemented with medical staff, could help the BOP provide aging inmates more efficient medical care, as well as identify unique programming needs.

Fourth, the programming opportunities to help aging inmates reenter the community are inadequate. There are no standardized programs specifically designed for aging inmates. While institutions have the flexibility to create local programs or activities to address the needs of their population, few have such programs or activities for aging inmates, including those institutions with high percentages of such inmates. As a result, aging inmates either participate in programs that may not meet their needs or are left idle, not participating in any activities. The BOP's release preparation program does not address the unique release needs of aging inmates, including those aging inmates who do not plan to seek employment after release or require assistance with continuity of medical care. The BOP should consider developing programs specifically tailored for aging inmates and enhance its release preparation program to address the unique needs commonly associated with the release of aging inmates.

Fifth, many aging inmates could be viable candidates for early release. We found that aging inmates have fewer misconduct incidents while incarcerated and a lower rate of re-arrest after release. Our analysis concluded that aging inmates comprised 10 percent of all BOP misconduct incidents in FY 2013, while accounting for 19 percent of the entire population. Based on our research and discussions with BOP officials and staff, we consider the rate of misconduct by aging inmates during incarceration to be relatively low compared to younger inmates. In addition, we found that only 15 percent of a sample of aging inmates released from BOP custody was re-arrested for a new crime within 3 years. Based on studies by the BOP and the BJS, we also consider the rate of re-arrest for aging inmates to be relatively low compared to the re-arrest rates of younger inmates. Therefore, while individual cases will vary, aging inmates are generally less of a threat during incarceration and less likely to be a threat to society once released.

Finally, we found that the BOP's revised eligibility provisions for inmates age 65 and older to request compassionate release have not been effective in achieving the Department's goals. In August 2013, the Attorney General announced expanded provisions for inmates age 65 and older to

seek compassionate release as part of the Department's Smart on Crime initiative. While a Department working group determined that inmates age 65 and older could be appropriate candidates for compassionate release, and the BOP revised its program statement to include three new provisions under which these inmates could apply, these provisions are based on existing statutes, which previously resulted in few inmates released from BOP custody. Because of the limitations in the revised provisions, we found that only two aging inmates have been released since the BOP revised the compassionate release policy. While we found that the BOP's eligibility provisions for aging inmates to request compassionate release are currently ineffective, our analysis shows that the BOP could more fully achieve the outcomes the Department seeks by using its existing authority to further revise its eligibility provisions. Expanding the eligibility provisions, such as lowering the age requirement to age 50 and revising the time served provisions for those aging inmates without a medical condition, would increase the pool of potential candidates for compassionate release and further assist the BOP in reducing overcrowding and could save the Department millions of dollars.

## Recommendations

To ensure the BOP continues to provide safe, humane, and cost-efficient care within its institutions and to further assist the BOP in managing its aging inmate population, reducing overcrowding, and reducing incarceration costs, we recommend that the BOP:

1.  Develop national guidelines for the availability and purpose of inmate companion programs.

2.  Consider the feasibility of placing additional Social Workers in more institutions, particularly those with larger populations of aging inmates.

3.  Provide all staff training to identify signs of aging and assist in communicating with aging inmates.

4.  Reexamine the accessibility and the physical infrastructure of all of its institutions to accommodate the large number of aging inmates with mobility needs.

5.  Study the feasibility of creating units, institutions, or other structures specifically for aging inmates in those institutions with high concentrations of aging inmates.

6.  Systematically identify programming needs of aging inmates and develop programs and activities to meet those needs.

54

7.    Develop sections in release preparation courses that address the post-incarceration medical care and retirement needs of aging inmates.

8.    Consider revising its compassionate release policy to facilitate the release of appropriate aging inmates, including by lowering the age requirement and eliminating the minimum 10 years served requirement.

54